LEWIS P. WHITCOMB, Appellee, v. SMITH COLLIER, DAISY COLLIER, A. K. FINCK, ET AL., Appellants..

**Attorney and client:** ABUSE OF CONFIDENCE: SETTLEMENT: FRAUD.
1　An attorney who has been employed and received the confidence of his client is incompetent to accept a retainer from the other party in the same matter, even though he may have been discharged from the first employment and does not violate any confidence thus obtained. In the instant case a settlement for damages for debauching a young girl, brought about by an attorney on behalf of the girl's friends who had previously been employed by the aggressor, is held to have been the result of undue influence obtained through his confidential relations to the accused and should be set aside.

**Settlement:** VACATION: STATUS QUO. A judgment setting aside a
2　settlement of an alleged claim and decreeing a return of the amount paid, thus remitting defendant to his action for damages, is not objectionable on the ground that the parties can not be placed in statu quo, although plaintiff may have disposed of property on which defendant had no lien.

**Same:** INTEREST. On the vacation of a settlement for fraud and
3　judgment for return of the consideration plaintiff is entitled to interest.

*Appeal from Clarke District Court.*— HON. H. M. TOWNER,
Judge.

WEDNESDAY, FEBRUARY 13, 1907.

ACTION to set aside a settlement alleged to have been
secured through fraud, duress, and undue influence, in which
defendants' conspired to cheat, wrong, and defraud the plain-
tiff out of his money and property. The trial court set
aside the settlement, and gave plaintiff judgment for the
amount of property secured from him. Defendants appeal.
— *Affirmed.*

*Stuart & Stuart,* and *Stivers & Slaymaker,* for appel-
lants.

*Temple, Hardinger & Temple,* and *W. S. Hedrick,* for
appellee.

PER CURIAM.— It appears that a civil action was about
to be commenced against the plaintiff for debauching a young
girl something like thirteen years of age by the name of
Daisy Collier, who had many years ago been adopted by
plaintiff or his wife and who after the death of plaintiff's
wife returned to her father's (Smith Collier's) home in
Osceola, Iowa, and was residing with him when it is claimed
the ravishment occurred. In order to settle this matter
plaintiff paid to counsel for the girl and her father some-
thing like $2,455; $700 of which was invested in a house
and lot in Osceola in the name of Daisy Collier, and the re-
mainder save the sum of about $245, which was paid out at
various times for the benefit of the girl, is now in the hands
of the attorneys. It is claimed that defendants conspired
and confederated together to cheat, wrong, and defraud the
plaintiff, and that, by duress, threats, and undue influence,
they induced plaintiff to make the settlement, and to de-
liver over the money paid. The defendants each denied

these charges, and some of them pleaded counterclaims for damages. The issues thus presented are almost wholly of fact, and no good purpose would be subserved in setting out the testimony *in extenso*. It is necessary, however, to give a brief review of the case, and to state some of our conclusions upon the whole record, in order that the case may be understood and the final result comprehended. After the death of plaintiff's wife, he being childless, the adopted child, Daisy, was returned to her father, Smith Collier, whose wife it appears was also dead. As the girl budded into womanhood, plaintiff began to show her some attentions. He purchased clothing for her, met her when he was in town — he living upon a farm in the country — walked the streets with her, took her to restaurants occasionally for meals, and went with her to theaters. He insists that these attentions were due to the wants, desires, and necessities of the child, and were given with the consent of the father. With the consent of the father he had her at his place at least twice during the summer of 1903, and once went with her to visit a relative or neighbor. During the last week of May in the year 1904, there was a theater or show in Osceola on Friday and Saturday nights, and plaintiff came to Osceola on Thursday of that week, forgetting the exact evenings of the theater, and made arrangement to take the girl to these entertainments. When in Osceola plaintiff stopped with an old friend, Finck, who is one of the defendants in this suit. He went to his place when he came in to attend the theater. With the girl he went to the entertainment on Friday evening, and the child, evidently being somewhat ashamed of her aged escort, eluded him just as the theater was out, but joined him again. Arrangements were made to attend the next evening, but the girl concluded not to go with him, but with some girl friends near her own age. Plaintiff sought in every way to find the girl Saturday evening, in which effort the natural father assisted, but all to no avail. Late that night plaintiff returned to Finck's house in an ex-

cited and uneasy condition and endeavored to engage Finck in conversation; Finck insisted upon retiring, which they did. The next morning, Sunday, it is claimed that plaintiff took up the matter of the child's conduct with Finck, and that during that conversation he confessed to Finck that he had many times had improper relations with the girl, and that he was immediately upbraided by Finck, who expressed himself rather freely and forbade the further hospitality of his house. All concede that at this time there was talk of employing an attorney, and that as a result thereof one Slaymaker, who resided but a short distance from Finck's house, was sent for, and that he appeared in response to this request some time Sunday afternoon.

There is a dispute as to what occurred when this attorney appeared, but we think it is sufficiently shown that plaintiff made a statement as to his actual relations with the girl, or as to what had been claimed were their relations, and that Slaymaker was employed as attorney for plaintiff, although no retainer was paid or agreed upon. It was arranged that Slaymaker should ascertain whether or not any criminal proceedings had been commenced or were threatened against the plaintiff, and that the attorney should notify plaintiff as to the results of his examination. Plaintiff returned to his home Monday morning, which, as we understand, was Decoration Day, and either on the next day or one week from the next day he received a telephone message to come to Osceola. Pursuant to this notification plaintiff with a nephew came to Osceola, and went to see the attorney, and it is admitted by all that the interview he had was not satisfactory. Slaymaker says that at this time plaintiff discharged him as an attorney, while this is denied by plaintiff and his nephew. Whatever the truth about this, it does appear beyond all question that on the Monday following the Sunday of the alleged confession to Finck, or upon the second Monday following, he, Finck, hunted up Smith Collier, the father of the girl, and told him of the

circumstances of the alleged confession. Thereupon Collier
went to the county attorney and was informed by him that
he could not take a civil case involving a criminal matter.
Thereupon he, Collier, went to the firm of which Slaymaker
was a member and arranged with him to take the case. Finck
went with Collier when the arrangements were finally made
with the attorney, and the following written contract was
drawn up between them: " This agreement made and en-
tered into this 6th day of June, 1904, by and between Smith
Collier of Clarke county, Iowa, party of the first part, and
Stivers and Slaymaker, parties of the second part, wit-
nesseth: That the party of the first part has this day em-
ployed second parties as his attorneys to prosecute all claims
he has against L. P. Whitcomb, for damages, and for said
services, said party agrees to pay to said second parties a sum
of money equal to one-half of the amount recovered whether
by suit, compromise or settlement. Said matters not to be
settled without consent of both parties hereto. In witness
whereof, we have hereunto affixed our hands and seals at
Osceola, Iowa, on the date first above written."

   This was done on Monday, June 6th. After seeing
Slaymaker in response to the telephone call, plaintiff went to
Ft. Madison to see a sick relative, and the next heard of the
case were rumors of a civil action aided by an attachment of
plaintiff's property. Thereupon one Landis, who was a
neighbor of plaintiff and of his nephews, interested himself
in the matter, and, upon the 9th of June he, Landis, went
out to see Whitcomb or the nephews, and finding Whitcomb
away stated to one of the nephews that action had been
brought, and that an attachment was about to be levied.
These parties suggested certain schemes to defeat the attach-
ment. They consulted attorneys and found this could not
be done, and then it was suggested that Landis go to the at-
torneys for Collier and find out what the matter could be
settled for. He found it could be settled for $2,500. One
of the nephews immediately went to Ft. Madison to get plain-

tiff and returned with him to Osceola at 2 o'clock a. m. Saturday morning, June 11th. Arising next morning they went immediately to the office of the attorneys and then arranged for a settlement and to get the larger part of the money by placing a mortgage upon land owned by plaintiff. The arrangement was finally consummated the next Monday morning, and plaintiff was given a receipt in full, not stating the amount paid, for all claims of every nature held by Smith or Daisy Collier against him. This receipt seems to be dated the 12th day of June, which was Sunday, but the time was Monday the 13th. The exact amount paid in settlement, as we understand it, was $2,455. Finck was paid the sum of $40 for some purpose not fully disclosed, $700 was invested in property, and about $245 paid to the girl, Daisy. Shortly after the settlement another attorney appeared upon the scene, who suggested to the nephews that plaintiff had been defrauded, and on June 30, 1904, an action was brought by plaintiff to recover damages from defendants on account of duress and fraud. This action was dismissed without prejudice, and another was commenced December 10, 1904, based upon the same grounds, and, a demurrer to the petition in that case being sustained, it was also dismissed without prejudice. This action was commenced February 20, 1905. It is claimed, and much testimony was introduced to show, that defendants, or some of them, particularly Slaymaker, made various threats against plaintiff, both to him and to his nephews, to send him to the penitentiary, to despoil him of his property, and otherwise injure him financially. Testimony was also given to the effect that defendants claimed that plaintiff had made confessions to them that he had made a written confession taken down by Finck and signed by him, plaintiff. And there is testimony to show that Slaymaker stated that plaintiff had confessed to him that, if he did not settle the matter up, he would see that he was sent to the penitentiary. These alleged threats are denied by Finck and by Slaymaker, par-

ticularly by the latter, and Landis denies that he was doing anything in the matter save as one friend would for another.

In the view we take of the case, it is not necessary to determine many of these issues. We do not think there is any evidence of a conspiracy as between Landis and the other defendants, and doubt if there is sufficient evidence to make a case of either fraud or of duress, as these terms are used in law. But there is no doubt in our minds that plaintiff retained Slaymaker as his lawyer, that he gave him his full confidence at the first interview, and that he did not at any time discharge or release him. But even if he were discharged or released, Slaymaker was in no position to take the other side of the case, no matter if he held plaintiff's confidence inviolate. The probabilities are that Slaymaker thought that, so long as he did not violate any of plaintiff's confidences, he could take the other side of the case. The evidence in the record before us leads us to believe that Smith Collier went to Slaymaker and engaged him to take the case before he, Slaymaker, caused the telephone message to be sent to plaintiff to come into town and to his office, and the transactions which took place when plaintiff and his nephew appeared are strong confirmation of this thought. This is also corroborated by the testimony of the county attorney. The district court found from plaintiff's appearance while on the witness stand that he was a very ignorant man, one easily influenced, and, while not stupid or simple minded, was not strong minded or well grounded. The record confirms this view. That plaintiff was worried over the situation and his relations with the girl is very clear. Whatever these may have been, he divulged them to his attorney whom he employed on that Sunday afternoon. Soon thereafter he is confronted with a claim by the girl or the girl's father, his previously employed attorney to whom he had divulged his case representing the claimant. After being told all that

1. ATTORNEY AND CLIENT: abuse of confidence: settlement: fraud.

had been done, of the alleged confession both oral and written which were out against him, of the fact that he might be sent to the penitentiary, he is finally brought back from Ft. Madison and taken by his nephew into the presence of his attorney without being permitted to counsel any one else, finds his attorney upon the other side of the case, his friend, Finck, claiming that a confession had been made to him, that he made the same confession to his attorney which was heard by Finck, taken down by him and signed by plaintiff. He is told that this is the only way to escape the penitentiary and is advised by all that it was best to make the settlement. It may be that this advice, coming from disinterested parties would have been good, but courts cannot permit such settlements to stand. After an attorney has been employed he cannot become engaged upon the other side of the case. The relation of attorney and client is one of confidence and trust, and that relation must be so protected as that a client may, with perfect impunity, disclose the weak points of his case as well as the strong ones. Proper administration of justice would soon cease if attorneys were permitted, after having received full, frank and free disclosures from the clients, to go to the other side, no matter what the excuse which might be offered. This is well illustrated in the present case. Plaintiff was a man who was easily influenced, he was an ignorant man, a suspicious man. He knew or thought he knew of the disadvantage he was under. Here was his attorney upon the other side of the case, claiming that he held confessions sufficient to make out the case. He had been advised on all hands to settle or he would have to go to the penitentiary and would probably lose all his property. By the settlement his attorney was getting one-half of what was recovered. His interest, then, was to get all he could. He had received nothing from plaintiff, and, so far as shown, did not expect to. On the whole, we think there is such a case of undue influence resulting from the confidential relations existing between plaintiff and his at-

torney, such a breach of trust, that this settlement should be set aside and plaintiff be given judgment for the return of his money. This was the finding of the learned trial judge, and with it we are in accord.

Some technical objections are made to the judgment and decree. It is now said that the parties cannot now be placed in *statu quo*. This is not so. The Colliers have

2. SETTLEMENT:
 vacation:
 *status quo.*

their action for damages against plaintiff if they ever had one. It is true that plaintiff had parted with some or all of his property, but none of the defendants ever had a lien upon it or any part of it. If he has parted with the property he has presumptively at least its equivalent. With the settlement set aside and the money paid thereon returned, the parties stand just as they did before the action was commenced. The settlement out of the way, a benefit has been conferred upon defendants without any consideration, and an implied promise upon their part arose to return the money received. No complaint is made of the decree upon the part of Finck as we understand it. The attorneys assumed to act for the Colliers, and whatever was done by these attorneys was for, or on behalf of, their clients, and they are bound by what was done at least to the extent of the money or property in their hands. We do not and cannot, upon this appeal, determine whether or not plaintiff was guilty of the offense charged against him. If he is, the matter will undoubtedly be settled in a proper tribunal. The decree here has no bearing upon that proposition.

Of the cases cited by counsel none seem to be exactly in point. *State v. Halstead*, 73 Iowa, 376, contains a clear exposition of the duties of attorneys to clients, and may well be read in connection with this opinion. Neither *Humphrey v. Darlington*, 15 Iowa, 207, nor *Shoemake v. Smith*, 80 Iowa, 655, relied upon by appellant, are in point. We need not review these cases further than to state that in each the client knew of the situation and made no objection to

the attorney appearing upon the other side. The questions were raised after the verdict, and no claim of fraud or undue influence was involved in either case. In each the question was one of procedure in courts which rendered judgments against the party complaining. Even in such cases, where the question is raised at a proper time, a client is protected. State v. Halstead, *supra,* and *State v. Rocker,* 130 Iowa, 239. *Harper v. Perry,* 28 Iowa, 60, has some bearing upon the questions of law involved.

Plaintiff has appealed from the judgment because no interest was allowed. This was evidently an oversight on the part of the trial judge. The judgment should have provided for interest at the rate of 6 per cent. from June 13, 1904. To this extent it will be modified, and as thus modified it will stand.— *Affirmed.*

3. SAME: interest.